UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JOSE FUENTES,

                              Plaintiff,              **<u>MEMORANDUM AND ORDER</u>**
                                                     2:17-cv-825 (DRH)(AKT)

        - against -

SCAG POWER EQUIPMENT – DIVISION
OF METALCRAFT OF MAYVILLE, INC.,

                              Defendant/Third Party
                              Plaintiff,

        - against -

J. RATTO LANDSCAPING, LTD.,

                              Third Party Defendant/
                              Counter Claimant,

        - against -

SCAG POWER EQUIPMENT – DIVISION OF
METALCRAFT OF MAYVILLE, INC.

                              Counter Defendant.

--------------------------------------------------------X

**APPEARANCES**

**ALONSO KRANGLE LLP**
Attorney for Plaintiff Jose Fuentes
445 Broad Hollow Road Suite 205
Melville, NY 11747
By:     Andres F. Alonso, Esq.


**MCELROY, DEUTSCH, MULVANEY & CARPENTER LLP**
Attorney for Defendant/Third Party Plaintiff Scag Power Equipment - Division of Metalcraft of
Mayville, Inc.
225 Liberty Street 36th Floor
New York, NY 10281
By:     Brian James Carey, Esq.

**CRIVELLO CARLSON SC**
Attorneys for Defendant/Third Party Plaintiff Scag Power Equipment - Division of Metalcraft of Mayville, Inc.
710 N. Plankinton Ave.
Milwaukee, WI 53203
By:     Donald H. Carlson, Esq.
        Eric D. Carlson, Esq.

**MCMAHON, MARTINE & GALLAGHER, LLP**
Attorney for Third Party Defendant/Counter Claimant J. Ratto Landscaping, Ltd.
55 Washington Street
Brooklyn, NY 11201
By:     Patrick Walsh Brophy, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

Plaintiff Jose Fuentes ("Plaintiff") brought this action against Defendant/Third-Party Plaintiff, Metalcraft of Mayville, incorrectly sued as Scag Power Equipment – Division of Metalcraft of Mayville, Inc. ("Metalcraft"). Plaintiff originally brought this products liability action in state court, but Metalcraft removed it to this Court under 28 U.S.C. § 1332(a), based on diversity of the parties. Presently before the Court is Metalcraft's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the motion is granted as to all claims.

## BACKGROUND

The following facts are taken from the parties' submissions, and are undisputed unless noted otherwise.

Plaintiff is originally from El Salvador, where he lived until the age of 20. (Pl.'s R. 56.1 Stmt. [ECF No. 46-1] ¶ 5 at 16.) His highest level of education is the 9th grade, and he does not

read or write English.[1]  (*Id.* ¶¶ 23–24.)  On September 20, 2013, Plaintiff had an accident while operating a lawn mower.  (Metalcraft's R. 56.1 Stmt. [ECF No. 45-12] ¶ 1.)  At the time of this accident, Plaintiff was employed by Third Party Defendant, J. Ratto Landscaping, LLC ("Ratto").  (*Id.*)

The subject mower ("Mower") is a Scag SW36A-16KAI walk-behind lawn mower that was manufactured by Metalcraft and its Scag Power Equipment Division in December 2007.  (*Id.* ¶¶ 2–3.)  The Mower was owned and maintained by Ratto.  (*Id.* ¶ 8.)  It is a heavy-duty, commercial self-propelled walk-behind lawn mower.  (*Id.* ¶ 4.)  The Mower was sold with an operator's manual, that is in both English and Spanish.  (*Id.* ¶ 5.)  Additionally, the Mower is equipped with a number of warnings "advising an operator as to potential hazards and referring the operator to read the operator's manual[.]"  (*Id.* ¶ 6.)  Most of the warning decals on the Mower are in English, however the same decals are available in Spanish and the operator's manual instructs that Spanish warning decals can be acquired.  (Pl.'s R. 56.1 Stmt. ¶ 7.) Likewise, the Mower has one decal that is written in Spanish, affixed right in front of the handlebars, that advises the operator that all warning decals are available in Spanish at a Scag retailer.  (*Id.*)

At some time, an aftermarket grass catcher that was not manufactured or approved by Metalcraft was installed on the Mower.  (Metalcraft's R. 56.1 Stmt. ¶¶ 12–13.)  Apparently the bracket used to secure this aftermarket grass catcher partially rubbed off warning labels regarding the hazards of operating the mower with an open discharge chute.  (*Id.* ¶ 13.) Plaintiff

---

[1] Plaintiff states in his deposition that he had previously read a "small" Lawn Boy user manual.  (Pl's Dep., Ex. A to Eric D. Carlson Aff., at 19.)  However, Plaintiff does not specify whether the Lawn Boy manual was written in English or Spanish.  Defendant Metalcraft assumes that the manual was "in English," *Mem. in Supp.* at 10, but provides no basis for this conclusion and there is nothing in Plaintiff's deposition indicating that he read a user manual in English or can read any English at all.

claims in his Rule 56.1 Statement in response that the Mower was equipped with a chute cover when it left the factory, and that the design of the Mower required the removal of such cover in order to attach the aftermarket grass catcher. (Pl.'s R. 56.1 Stmt. ¶¶ 35, 37.) When the chute cover was removed, "the aperture on the right side of the machine would remain open." (*Id.*)

Metalcraft states that "[a]t the time of the accident, neither a grass catcher, discharge chute, nor mulching plate were affixed to the [Mower]." (Metalcraft's R. 56.1 Stmt. ¶ 11.) Plaintiff confirms that on the date of the incident he was told to use the Mower without the grass catcher in place by his foreman. (Pl.'s R. 56.1 Stmt. ¶ 26.) For reasons that are not addressed in the record, Plaintiff and/or his employer failed to replace the chute cover even though the aftermarket grass catcher was removed and the operator's manual that was provided to the Mower's purchaser indicated not to operate the Mower with an unguarded discharge chute.[2] (*See* Metalcraft's R. 56.1 Stmt. ¶ 14.) In other words, the right side of the Mower aperture was completely exposed, despite the warning labels and instructions in the manual stating that the Mower should never be operated in this manner. Moreover, at the time of the accident, the Mower also had mechanical issues related to worn brakes. (*Id.* ¶ 9.) Plaintiff was advised of this issue with the brakes prior to operating the Mower, but he had never used it before the date of the accident so he did not know how that would affect the Mower's operation. (*Id.* ¶¶ 9–10; Pl.'s R. 56.1 Stmt. ¶ 9.)

On the date of the incident, Plaintiff was at a customer's property alone. (Pl.'s R. 56.1 Stmt. ¶ 28.) Plaintiff first mowed the backyard of the customer's property, and then began to mow the front. (Def.'s R. 56.1 Stmt. ¶¶ 17–18.) While doing so, the Mower hit some tree roots and Plaintiff lost control of the Mower. (*Id.* ¶ 18.) Plaintiff let go of the Mower with one hand

---

[2] It is undisputed that the same warning appeared on a decal located on the deck of the Mower, but this warning decal was partially obscured by the aftermarket grass catcher.

when it collided with the tree roots, but he failed to let go of the gas on the handlebar with the other hand so the Mower spun around and Plaintiff's left foot went into the unguarded, open discharge chute. (*See id.* ¶ 19.) Plaintiff's left foot was cut by the mower blades and he suffered a partial amputation as a result. (*Id.* ¶ 21.) Plaintiff concedes that if he had "let go of the handle bars of the Mower at the time he lost control, the engine and the blades of the [Mower] would have shut off." (*Id.* ¶ 20.)

## DISCUSSION

### I.  *Legal Standard*

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. &*

*Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II. The Parties' Arguments

Plaintiff asserts four claims against Metalcraft: (1) negligence; (2) strict products liability for failure to warn and/or provide sufficient instructions; (3) strict products liability based on design defect; and (4) breach of implied warranty. (Compl. [ECF No. 1-1] ¶¶ 8–43.)

In its moving papers, Metalcraft claims that Plaintiff's expert fails to pass muster under Rule 702 and as such, Plaintiff cannot make a prima facie showing that he sustained injuries because of specific design defects in the Mower, or that Metalcraft failed to provide adequate warnings and/or instructions to Plaintiff prior to use. (Metalcraft's Mem. in Supp. [ECF No. 45-11] at 3.) Plaintiff responds that his expert is qualified and his opinions are amply supported under Rule 702.

III. *Dr. Sadegh's Expert Testimony is Excluded as Unreliable*

A. Rule 702 Legal Standard

Rule 702 governs the admissibility of expert testimony, and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principle and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702.

A court can "'decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment.'" *Taylor Precision Products, Inc. v. Larimer Group, Inc.*, 2018 WL 4278266, at *31 (S.D.N.Y. March 26, 2018) (quoting *Bah v. Nordson Corp.*, 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005)). Under Rule 702, expert testimony is usually admissible where it is relevant and reliable. *Taylor*, 2018 WL 4278266, at *31 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). "Because of this liberal admissibility standard, exclusion of expert testimony is warranted only when the district court finds 'serious flaws in reasoning or methodology.'" *Taylor*, 2018 WL 4278266, at *31

(quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)). "[I]f an expert's testimony falls within 'the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court.'" *Taylor*, 2018 WL 4278266, at *31 (quoting *Kumho Tire, Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." *Taylor Precision Products, Inc. v. Larimer Group, Inc.*, 2018 WL 4278286, at *32 (E.D.N.Y. March 26, 2018) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).

B. Dr. Sadegh's Expert Testimony is Inadmissible Under Rule 702

Here, Plaintiff's expert, Dr. Sadegh intends to testify that the Mower is defective. In the expert report in question, Dr. Sadegh sets forth the following four conclusions with regards to the Mower: (1) the unitary activation of the operator presence control ("OPC") is defective; (2) the Mower does not comply with ANSI B71.4 3; (3) the chute cover design was defective; and (4) the warning decals affixed to the Mower should have been written in English and Spanish. (Metalcraft's Mem. in Supp. at 19 (citing Carlson Aff., Ex. G, Expert Report of Ali M. Sadegh (July 9, 2018) at 11–14).)

Metalcraft argues in its motion for summary judgment that Dr. Sadegh has provided speculative testimony and his report must be excluded pursuant to Rule 702. In support of this argument, Metalcraft avers that: (1) "Dr. Sadegh's position that the unitary activation of the operator presence control is defective on the Scag mower is unfounded[;]" (2) the mower complies with ANSI B71.4.3; (3) the chute cover design was not defective, rather the issue was that Plaintiff's employer had removed the chute cover; and (4) "his assertion that the [Mower]

was deficient because the warnings were unavailable in Spanish is a non-issue" because "Dr. Sadegh admits that Metalcraft provided the warnings for the Scag lawn mower in both English and Spanish." (*Id.* at 19.)

       1.  Dr. Sadegh is Qualified to Testify as an Expert

Metalcraft does not contest Dr. Sadegh's qualifications in its Memorandum in Support, however Plaintiff broaches this issue in his Response in Opposition, and Metalcraft opposes it in its Reply Memorandum in Further Support. Accordingly, the Court will briefly address Dr. Sadegh's qualifications here. As set forth in Rule 702, "the court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training, or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (quoting Fed. R. Civ. P. 702). "An expert need not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) (quoting *Yaccarino v. Motor Coach Indus., Inc.*, 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006)) (internal quotation marks omitted). "[W]here an expert possesses qualifications in a 'general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Hilaire*, 54 F. Supp. 3d at 236 (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 425 (E.D.N.Y. 2011)).

Here, Plaintiff concedes that Dr. Sadegh has never worked for a lawnmower manufacturer or designed a lawnmower. However, Plaintiff contests that Dr. Sadegh is otherwise qualified as an expert due to his positions as professor of engineering and Director of

the Center for Advanced Engineering Design and Development at the Department of Mechanical Engineering at the City College of the City University of New York, his undergraduate and masters degrees in mechanical engineering, and his Ph.D in mechanics. (Mem. in Opp. at 7.) Dr. Sadegh is also certified by the Society of Automotive Engineers in accident reconstruction as well as injury, anatomy, and biomechanics. (*Id.* at 7–8.) Having considered Dr. Sadegh's qualifications, the Court finds that it is not necessary that he be a lawnmower engineer in order to opine on questions of the safety elements of a lawn mower design. *See Hilaire*, 54 F. Supp. 3d at 242. The Court concludes that he is qualified to testify in this case. *Id.* Dr. Sadegh's lack of knowledge and experience on lawnmowers specifically will go to the weight of his testimony.

### 2. Dr. Sadegh's Testimony is Not Reliable

As the Court has determined that Dr. Sadegh qualifies as an expert, the Court will now examine the reliability of his expert report on the Mower. "To gauge the reliability of proffered testimony, 'the district court should consider the indicia of reliability identified in Rule 702,' which are not exhaustive." *United States v Raniere*, 2019 WL 2212639, at *5 (E.D.N.Y May 22, 2019) (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004)). The Supreme Court has set forth four additional factors that courts may consider, including: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) in the case of a particular scientific technique, the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained 'general acceptance.'" *Id.* (quoting *Daubert*, 509 U.S. at 593–94.) A district court's inquiry into the reliability of expert testimony is "flexible," and the *Daubert* factors are not dispositive; they "'neither necessarily nor exclusively appl[y] to all experts or in every case.'" *Raniere*, 2019 WL

2212639, at *5 (quoting *Daubter*, 509 U.S. at 593–94) (alterations in original). Likewise, "[t]he Second Circuit's standard for admissibility of expert testimony is especially broad." *United States v. Herron*, 2014 WL 1871909, at *6 (E.D.N.Y. May 8, 2014).

On the other hand, "an expert's opinions that are without factual basis and are based on speculation or conjecture . . . are inappropriate material for consideration on a motion for summary judgment. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). An expert can provide reliable testimony by *inter alia* citing to reports, providing in-depth analysis of the facts, providing peer reviewed data, and explaining the basis for his or her conclusions. *Compare United States v. Raniere*, 2019 WL 2212639, at *7 (E.D.N.Y. May 22, 2019) (finding that quibbles with the level of detail and intellectual rigor in expert reports "are too minor to preclude [the expert] from testifying" where such expert cited studies as support for her opinions), *with Foley v. United States*, 294 F. Supp. 3d 83, 94 (W.D.N.Y. 2018) (holding that an expert report was unreliable where it was "simply devoid of any explanation regarding how [the expert's] professional experience led him to [his] conclu[sions]"). "[I]n performing the reliability inquiry under *Daubert*, 'a court is to consider whether the testimony is grounded in facts or data and reliable methods or principles, and whether the witness has applied the principles and methods to the facts of the case.'" *Whalen v. CSX Transportation, Inc.*, 2016 WL 5723877, at *14 (S.D.N.Y. Sept. 29, 2016) (quoting *Smith v. Herman Miller*, 2005 WL 2076570, at *3 (E.D.N.Y. Aug. 26, 2005)). "An otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion." *Whalen*, 2016 WL 5723877, at *14 (quoting *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 416–17 (W.D.N.Y. 2005)) (internal quotation marks omitted). Finally, in a strict products liability case based on design defect like the case at

bar, "the touchstone of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs." *Whalen*, 2016 WL 5723877, at *13 (quoting *Hilaire*, 54 F. Supp. 3d at 244) (internal quotation marks omitted).

Dr. Sadegh's expert report is seventeen pages long. The first two pages provide his qualifications, the following seven pages relay a recitation of the facts and the sources that Dr. Sadegh reviewed, and then the report provides a half-page summary of Dr. Sadegh's investigation of the Mower. The final seven pages consist of a summary of Dr. Sadegh's conclusions about the accident.

In the report, Dr. Sadegh provides no "facts, data, [or] reliable methods or principles" that support his opinions. *See Whalen*, 2016 WL 5723877, at *14. The report is utterly devoid of any investigative techniques beyond Dr. Sadegh's brief summary of his review of the Mower; nor does Dr. Sadegh "explain the technical basis for his opinion." *See id.* Rather, Dr. Sadegh seems to rely exclusively on his "knowledge and experience in the field of accident reconstruction, biomechanics, and mechanical engineering[.]" (Report of Dr. Ali M. Sadegh (Apr. 27, 2018), Ex. J to Andres F. Alonso Aff. [ECF No. 46-3] at 16.) However, Dr. Sadegh does not explain how he applied his knowledge and experience to the facts in reaching his conclusions. *See Hilaire*, 54 F. Supp. 3d at 244 (finding that an expert report was unreliable where the expert "d[id] not explain how he applied these principles in reaching the conclusions set forth in his 'Opinions' section"). Dr. Sadegh's findings consist largely of conclusory statements without analysis or support. Dr. Sadegh's methodology has not been peer-reviewed, and in fact, Dr. Sadegh provides little if any insight into how he arrived at his conclusions or whether those conclusions are shared with any other experts in the field. Perhaps the most glaring shortcoming is that there is no comparison of the utility and cost of the product's design

and alternative designs anywhere in the report, other than a passing reference that Metalcraft's decision not to add an interlocked plate design was "driven by marketing demands and not by any limitations in safety engineering." (Report of Dr. Sadegh at 13–14.) The Court will now analyze the reliability of each of Dr. Sadegh's four conclusions individually.

As for Dr. Sadegh's first conclusion that the unitary activation of the OPC is defective, he states that "[t]he [OPC] for this machine must be and should have been designed to trigger and disengage the engine and traction completely when the operator loses contact with the handle with either hand." (*Id.* at 12.) Dr. Sadegh claims that this design defect "combined with the inherent design of the machine caused the incident and injury" to Plaintiff. (*Id.*) However, Dr. Sadegh does not cite any authority in support of this position, nor does he explain how he arrived at this conclusion or whether any other mowers exist that have such a design. Dr. Sadegh merely states that similar safeguarding devices have been used in machines "in many industries for many years[,]" absent identifying any of the industries or machines with such a device or the specifics of any concomitant safeguards utilized. (*Id.*) Dr. Sadegh then states that Metalcraft is "aware of at least eighteen other incidental blade contact accidents involving belt drive walk-behind mowers. (*Id.*) Dr. Sadegh does not specify how many of these accidents, if any, involved the same model of mower as the one at issue here, nor does he state the statistical significance of this number. Dr. Sadegh only describes two of the eighteen accidents in any detail, but he does not provide enough information about these two accidents to discern whether the same alleged defect caused the injuries. Moreover, there was a damaged handlebar in one of the accidents that is a confounding factor. (*Id.* at 12–13.) Therefore, Dr. Sadegh's reference to these eighteen accidents provides no insight into why the OPC is defective or how the allegedly defective OPC caused Plaintiff's injury with the Mower. While "[a] minor flaw in an expert's reasoning or a

slight modification of an otherwise reliable method' does not itself require exclusion," exclusion is warranted "'if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Securities and Exchange Commission v. Lek Securities Corp.*, 370 F. Supp. 3d 384, 404 (S.D.N.Y. 2019) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). Here, Dr. Sadegh does not provide any grounds for his conclusion that the OPC is defective. Accordingly, his testimony as to his first conclusion is unreliable.

The same issues are present with Dr. Sadegh's second conclusion that the Mower does not comply with ANSI B71.4. Dr. Sadegh merely asserts that the OPC "needed to trigger a shutdown as soon as the operator lost contact with either handlebar and moved out of position while the vehicle was in motion." (Report of Dr. Sadegh at 13.) Dr. Sadegh does not elaborate on why this shutdown is necessary in order to comply with ANSI B71.4. Nor does he address Metalcraft's contention that there are no other commercial lawn mowers that use a different OPC system, or Plaintiff's admission that he kept his one hand on the gas throughout the incident. (*See* Mem. in Supp. at 4 – 5.) Therefore, Dr. Sadegh's testimony as to his second conclusion is also unreliable.

In support of his third conclusion that the chute cover design was defective, Dr. Sadegh cites to the deposition of Michael Huhman, an engineer for Defendant Metalcraft. According to Mr. Huhman, the Mower does not allow a chute cover to remain in place when the grass catcher is attached. (Report of Dr. Sadegh at 13 (citing Michael Human Dep., Ex. I to Eric D. Carlson Aff. [ECF No. 45-10])). Dr. Sadegh claims that there are many currently available walk-behind mowers with spring-loaded chute covers that swing out of the way when the grass catcher is attached and swing down to protect the chute when it is removed. (*Id.* at 13–14.) Furthermore, an OPC "chute cover with an interlocked block out plate, a potential fix to one of the defects in

the subject mower[,] is already manufactured by the defendant." (*Id.*) Apparently, the interlocked block out plate is only available for ride on mowers, but this decision was "driven by marketing demands and not by any limitations in safety engineering." (*Id.*) Dr. Sadegh does not provide the names of any other walk-behind mowers with a spring-loaded chute cover. Nor does he include any information regarding whether the incidence of injury is lower with walk-behind mowers with spring-loaded chute covers as compared with walk-behind mowers without spring-loaded chute covers. Furthermore, Dr. Sadegh does not explain how the spring-loaded chute cover or the interlocked block out plate would have interacted with the *aftermarket* grass catcher, so it is unclear whether Plaintiff's employer would have had to remove such safety devices to attach the aftermarket grass catcher regardless.[3] More to the point, Dr. Sadegh does not set forth any details whatsoever regarding the mechanics of the spring-loaded chute cover or the interlocked block out plate and whether these safety devices would have prevented the instant injury on the specific facts herein; namely, that Plaintiff hit a tree branch, lost control of the Mower, kept one hand on the gas, and let go with the other hand so that the Mower spun around and went over his foot. In summary, Dr. Sadegh provides little to no insight into "the technical basis for his opinion." *Whalen*, 2016 WL 5723877, at *14. Dr. Sadegh simply sets forth his unsupported conclusory statements that the machine design is defective and that the modifications he recommends would fix such defect. Accordingly, Dr. Sadegh's testimony as to his third conclusion is unreliable.

Regarding Dr. Sadegh's final conclusions, that the warning labels should have been written in Spanish, he opines:

---

[3] There is no evidence before the Court that Plaintiff's employer would have used a Scag grass catcher as opposed to an after-market grass catcher in the event that the Mower has a spring-loaded chute cover given that Plaintiff's employer chose not to purchase a Scag grass catcher in the first instance.

> According to the testimony of the defendant's witnesses there are warning signs available for this machine written in Spanish. Unfortunately, in order to obtain such warnings, an end user needs to request such signage from the manufacturer. All warnings on the machine provided to Mr. Fuentes were written in English. Given the knowledge of the demographics of the end users of the defendant's mowers, a reasonably prudent manufacturer should have insured that all of its mowers left the factory with warnings written in both English and Spanish.

(*Id.* at 14.) The language quoted above is the extent of Dr. Sadegh's testimony regarding the warning labels. There are no citations, no statistics, and no explanations as to why Metalcraft should have knowledge of the demographics of the end users – let alone any insight into why it is Metalcraft's responsibility to provide warning labels in more than one language as opposed to Plaintiff's employer's responsibility to acquire such labels. Dr. Sadegh further fails to address the uncontroverted fact that there was a warning sign in Spanish that was directly in front of the handlebars and would have been visible to Plaintiff. As such, Dr. Sadegh's fourth conclusion is unreliable.

IV.    *Metalcraft's Motion for Summary Judgment is Granted as to All Claims*

As summarized above, Plaintiff brought four claims against Metalcraft: (1) negligence; (2) strict products liability for failure to warn and/or provide sufficient instructions; (3) strict products liability based on design defect; and (4) breach of implied warranty. The Court will address each of these in turn below.

A.  Negligence

"New York courts generally consider strict products liability and negligence claims to be 'functionally' synonymous.'" *Cavanaugh v. Ford Motor Co.*, 2014 WL 2048571, at *5 (E.D.N.Y. May 19, 2014). "New York Courts have treated the difference between negligence and strict liability as inconsequential." *Cavanaugh*, 2014 WL 2048571, at *5 (quoting *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 437 n.24 (E.D.N.Y. 2013); *see also Savage v. Beiersdorf Inc.*,

2013 WL 55322756, at *5 (S.D.N.Y. Sept. 30, 2013) ("Failure to warn claims are identical under strict liability and negligence theories of recovery"); *Lara v. Delta Int'l Machinery Corp.*, 174 F. Supp. 3d 719, 739 (E.D.N.Y. 2016) ("Under New York law, a plaintiff's claim based upon an alleged design defect, sounding in either negligence or strict liability, requires the same *prima facie* evidentiary showing).

Here, Plaintiff has asserted a claim against Metalcraft for negligence. Though Plaintiff does not specify the parameters of his negligence claim in his Complaint, it seems that Plaintiff intends to assert a claim for negligent design defect and failure to warn. Given that such claims are functionally the same as the same claims brought in strict liability, the Court will analyze Plaintiff's strict liability and negligence claims together.

B.  Strict Products Liability for Failure to Warn

"To establish a claim for strict products liability under a theory of failure to warn, a plaintiff must prove that '(1) a manufacturer has a duty to warn[,] (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that failure to do so was the proximate cause of the harm.'" *Kennedy v. Covidien, LP*, 2019 WL 1429979, at *5 (S.D.N.Y. March 29, 2019) (quoting *Goldin v. Smith & Nephew, Inc.*, 2013 WL 1759575, at *5 (S.D.N.Y. Apr. 24, 2013)). As to the third element, an inadequate warning is a proximate cause of the harm if it is a substantial cause of the events leading to the injury. *Sorto-Romero v. Delta Intern. Machinery Corp.*, 2007 WL 2816191, at *11 (E.D.N.Y. Sept. 24, 2007) (citing *Belling v. Haugh's Pools, Ltd.*, 511 N.Y.S.2d 732, 733 (N.Y. App. Div. 1987)). "An act cannot be the 'substantial cause' if the injury would have occurred regardless of the content of a defendant's warning." *Sorto-Romero*, 2007 WL 2816191, at *11 (citing *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 370 (S.D.N.Y. 2003)).

The "*adequacy* of a warning generally is a question of fact" best reserved for trial. *Id.* (quoting *Kandt v. Taser Int'l, Inc.*, 2012 WL 2861583, at *3 (N.D.N.Y. July 10, 2012)) (emphasis in original). "Where a products liability claim is premised upon a failure to warn, a plaintiff may factually support his claims without utilizing expert testimony." *Lara*, 174 F. Supp. 3d at 744 (citing *Billiar v. Minn. Mining & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980) ("Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment considering all the circumstances"); *see also Sorto-Romero*, 2007 WL 2816191, at *12 ("A jury may assess the adequacy of a warning, even in the absence of expert testimony").

Here, Metalcraft does not dispute that Plaintiff can meet the first two elements of a failure to warn claim. Rather, the motion to dismiss focuses on the third element, causation. Metalcraft explains that the Mower *did* in fact provide a warning decal in Spanish, which was located on the controls in front of the operator. (Def.'s Mem. in Supp. at 14.) This decal instructs that all of the warning decals are available in Spanish. (*Id.*) There was also an English warning decal that alerted the operator to the dangers of operating the Mower with an unguarded discharge chute that had been obscured or otherwise rubbed off by "an aftermarket grass catcher, not approved by Metalcraft[.]" (*Id.* at 15.) There is no evidence before the Court that Metalcraft's warning decals were insufficient or that Metalcraft bears any responsibility for the undisputed facts that Plaintiff's employer: (1) failed to acquire the Spanish warning decals; (2) failed to translate the decals for Plaintiff or, if necessary, have the warnings read to him; (3) either failed to provide the operator manual or did not require Plaintiff to read such manual; (4) attached an aftermarket grass catcher obstructing the relevant warning decal regarding the discharge chute; and (5) specifically directed Plaintiff to operate the Mower without a grass catcher even though the

operator's manual and the warning decals expressly provided that the Mower should never be operated with an unguarded discharge chute.

Most significantly, Plaintiff cannot prove that the failure to warn was a substantial cause of his injuries because even if the warning decal stating not to operate the Mower without a chute cover had been in Spanish, Plaintiff could not have seen it or read it because it was obscured by the aftermarket grass catcher. While a failure to warn claim can go to the jury without expert testimony, Plaintiff cannot prove causation on the information provided as a matter of law; there are no outstanding questions of fact here. Therefore, the motion for summary judgment is granted as to Plaintiff's failure to warn claim, under both negligence and strict liability.

C. Strict Products Liability for Design Defect

"A defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." *Lara*, 174 F. Supp.3d at 740 (quoting *Scarangella v. Thomas Built Buses, Inc.*, 93 N.Y.2d 655, 659 (N.Y. 1999)) (internal quotation marks omitted). To establish a claim for defective design, Plaintiff must show: "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing Plaintiff's injury." *Lara*, 174 F. Supp.3d at 740 (citing *Barban v. Rheem Textile Systems, Inc.*, 2005 WL 387660, at *7 (E.D.N.Y. Feb. 11, 2005)). New York law requires a plaintiff to proffer expert testimony as to the feasibility and efficacy of alternative designs in order to prove liability on the grounds of a design defect. *Lara,* 174 F. Supp.3d at 740 (citing *Cuntant v. Hitachi KOKI USA, Ltd.*, 2009 WL 3334364, at *6 (E.D.N.Y. Oct. 15, 2009) (collecting cases)); *see also Frazer v. ITW Food Equip.*

*Grp. LLC*, 2013 WL 6164486, at *5 (S.D.N.Y. Nov. 22, 2013) (explaining that "[a] party cannot survive summary judgment on a design defect claim without admissible expert testimony"); *Sorto-Romero*, 2007 WL 2816191, at *10 (noting that "Plaintiff's design defect claim cannot proceed without expert testimony . . . .").

In the instant case, the Court has already found that Plaintiff's expert's report is not reliable, in part because there was no discussion whatsoever of "a comparison of the utility and cost of the product's design and alternative designs." *See Whalen*, 2016 WL 5723877, at *13. Plaintiff has not submitted the opinion of another expert in support of his claim. Without expert testimony from a person with the requisite technical and scientific knowledge that is beyond the ken of the average layperson, Plaintiff cannot meet his burden of proving that the Mower was, in fact, defective. In light of the lack of evidence supporting his claim, no issue of material fact exists and Plaintiff's design defect claim sounding under both negligence and strict liability must fail as a matter of law. *See Lara*, 174 F. Supp.3d at 741 (citing *Hilaire*, 54 F.Supp.3d at 252; *Sorto–Romero*, 2007 WL 2816191, at *10; *Delehanty v. KLI, Inc.*, 663 F.Supp.2d 127, 134 (E.D.N.Y. 2009)).

D.  Breach of Implied Warranty

"An implied warranty is breached where the product in question is not fit for the ordinary purpose for which it is to be used." *Cavanaugh*, 2014 WL 2048571, at *5 (quoting *Plemmons v. Steelcase Inc.*, 2007 WL 950137, at *3 (S.D.N.Y. March 29, 2007)) (internal quotation marks omitted). To prove a claim for breach of an implied warranty, a plaintiff must prove: "(1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; and (3) that the defect was the proximate

cause of the injury." *Lara*, 174 F. Supp. 3d at 745 (citing *Cavanaugh.*, 2014 WL 2048571, at *5).

"Liability under strict products liability and implied warranty are essentially the same." *Cavanaugh*, 2014 WL 2048571, at *5 (internal quotation marks and citations omitted); *see also Dalton v. Stedman Mach. Co.*, 2008 WL 351676, at *7 (N.D.N.Y. Feb. 7, 2008) ("The [New York] Court of Appeals has held that liability under strict products liability and implied warranty theory are essentially the same, except that under the implied warranty theory, it is not necessary to show the feasibility of alternative designs or the manufacturer's 'reasonableness' in marketing it in the unsafe condition" (quoting *Denny v. Ford Motor Co.*, 87 N.Y.2d 248 (N.Y. 1995))); *Vicuna v. O.P. Schuman & Sons, Inc.*, 298 F. Supp. 3d 419, 448 (E.D.N.Y. Oct. 31, 2017) ("In New York, Liability under theories of strict products liability and implied warranty are essentially the same").

If a plaintiff cannot make out a claim for strict products liability, then the breach of implied warranty claim will not stand. *See Cavanaugh*, 2014 WL 2048571, at *5 (holding that "Plaintiffs have not adequately pleaded a claim for strict products liability under a design defect, manufacturing defects, or failure to warn theory[,] [t]hus, Plaintiffs have failed to state a plausible claim that Defendants breached an implied warranty"); *see also Oden v. Boston Scientific Corp.*, 330 F. Supp. 3d 877, 895–96 (E.D.N.Y. June 4, 2018) ("As a breach of implied warranty claim requires that Plaintiff plead sufficient factual allegations that the Greenfield Filter was defectively designed or manufactured, and as the Court has previously found that Plaintiff has failed to plead the necessary predicate elements to support his design and manufacturing defect claims . . . Plaintiff's breach of implied warranty of merchantability claim necessarily fails as a matter of law"); *Morrison v. Hoffmann-La Roche, Inc.,* 2016 WL 5678546, at *11 (E.D.N.Y.

Sept. 29, 2016) ("Plaintiff's defective design claim fails and, thus, the breach of implied

warranty claim fails as well"); *Vicuna*, 298 F. Supp. 3d at 449 (denying a motion for summary

judgment as to an implied warranty claim because the strict liability claim remained). Here,

Plaintiff's strict products liability claims for design defect or failure to warn have both failed.

Likewise, without Dr. Sadegh's expert testimony, there is no evidence before the Court

that the Mower is not fit for the ordinary purpose for which it is used. It is well established that

the mere "fact that one accident occurred is insufficient to establish that [a product] was not

minimally safe for its intended purposes when it was shipped." *Dellatacoma v. Polychem Corp.*,

2014 WL 1641467, at *2 (S.D.N.Y. Apr. 24, 2014); *see also Valente v. Textron, Inc.*, 931 F.

Supp. 2d 409, 439 (E.D.N.Y. 2013) (granting summary judgment as to a breach of implied

warranty claim where plaintiffs produced no evidence of a statistically significant number of

accidents, among other issues). Here, Plaintiff's expert has stated that there are at least eighteen

other "incidental blade contact accidents" involving walk-behind mowers. However, as

discussed at length *supra*, Dr. Sadegh does not provide enough information about any of these

accidents to determine that a design defect or failure to warn caused the apparent injuries.

Accordingly, the only evidence before the Court is that one accident occurred with this model of

mower, which is insufficient standing alone to establish that a product is not minimally safe for

its intended purposes when it was shipped. *See Dellatacoma*, 2014 WL 1641467, at *2. Thus,

Metalcraft's motion for summary judgment is granted as to Plaintiff's final claim for breach of

implied warranty.

**CONCLUSION**

While Plaintiff suffered serious harm, his injuries are not traceable to Metalcraft on the

information provided. For the foregoing reasons, Metalcraft's motion for summary judgment is

granted as to all claims. Metalcraft's claims against Plaintiff's employer, Third Party Defendant Ratto, for contribution are rendered moot. Accordingly, the Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

Dated: Central Islip, New York
August 13, 2019

_____/s/_____
Denis R. Hurley
United States District Judge
